UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                    Case Number 05-80955

v.                                         Honorable David M. Lawson

PAUL SHELDON BUFORD, JR.,

        Defendant.
_____/

## ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

Defendant Paul Buford has filed a motion asking the Court to resentence him to time served under the authority of the compassionate release provision of 18 U.S.C. 3582(c)(1)(A)(i), as amended by section 603(b)(1) of the First Step Act of 2018, Pub L. 115-391, 132 Stat. 5194, 5239, or alternatively, to recommend to the Bureau of Prisons (BOP) that he be transferred to home confinement under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 18 U.S.C. 12003(b)(2). The government contends that Buford has not exhausted his remedies with the BOP, a necessary prerequisite for seeking compassionate release, but the record supports the opposite conclusion. Nonetheless, Buford has not demonstrated any extraordinary circumstances justifying immediate release. The Court also does not believe that a recommendation for early placement by the BOP to home confinement is appropriate. The motion will be denied.

I.

In June 2006, Buford was charged along with 41 others in a multi-count superseding indictment with drug trafficking offenses related to an organization known as the Black Mafia Family ("BMF"). Demetrius Flenory and his brother, Terry Flenory, were the leaders of the BMF. By the time Flenory and his brother were indicted, their enterprise had distributed massive quantities of cocaine across several states. At its height, the BMF was estimated to employ over

500 people. Buford worked for the BMF as Terry Flenory's right hand man in California. Among other things, Buford arranged drug deals, supervised distributors, loaded and unloaded vehicles with cocaine, and customized the BMF's transportation fleet to conceal evidence of drug trafficking activity. Even today, the BMF remains a well-known name in the community. *See* https://en.wikipedia.org/wiki/Black_Mafia_Family.

Buford's criminal history predates his arrest in this case and includes two concealed weapon convictions, convictions for tampering with a vehicle, domestic violence, grand theft firearm, grand theft auto, receiving and concealing stolen property and operation of a chop shop, and burglary. He was on parole for two offenses when he started working for the BMF.

Buford was also a fugitive from 2006 to 2009. He consented to detention when he appeared in Michigan. Eventually, Buford pleaded guilty to conspiracy to possess with intent to distribute over 120 kilos of cocaine, in violation of 21 U.S.C. §§ 841, 848, and conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h). In 2010, Judge Avern Cohn sentenced Buford to 240 months, below the guideline range of 324 to 405 months.

Buford presently is confined by the Bureau of Prisons (BOP) at Terminal Island FCI in Los Angeles, California. His scheduled release date is December 8, 2025. He has served about 11 years of his 20-year sentence. There have been several cases of COVID-19 at Terminal Island.

Buford is male, 50 years old, and of African-American descent. His medical records show that he suffers from hypertension (high blood pressure) (benign essential), asthma (prescribed an inhaler), mild kidney disease, and Stage II diabetes which he manages with exercise. His blood pressure and asthma are managed with medication. Significantly, on May 13, 2020, Buford received a positive test result for COVID-19. He was asymptomatic, quarantined, and is deemed recovered.

He states that, if released from prison to home confinement, he could reside with his wife and minor children in a home that has been in his wife's family for over 40 years.

II.

As a general rule, "a federal court 'may not modify a term of imprisonment once it has been imposed.'" *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)). "But that rule comes with a few exceptions, one of which permits compassionate release." *Ibid.* "The request may come through a motion in federal court filed by the Director of the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A). Or it may come through a motion filed by the inmate after he has 'fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the [prisoner]'s behalf' or after 'the lapse of 30 days from the receipt of such a request by the warden of the [prisoner]'s facility, whichever is earlier.'" *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Upon a proper motion via either avenue, the Court may, "[a]fter 'considering the factors set forth in section 3553(a) . . . reduce the prisoner's sentence if it finds that 'extraordinary and compelling reasons warrant such a reduction' or if the '[prisoner] is at least 70 years of age,' has 'served at least 30 years,' and meets certain other conditions." *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)(i), (ii)). However, prisoners may not seek judicial relief before they have sought release under this statute from the prison warden. "Even though [the] exhaustion requirement does not implicate [the Court's] subject-matter jurisdiction, it remains a mandatory condition," and "[i]f the Director of the Bureau of Prisons does not move for compassionate release, a prisoner may take his claim to court only by moving for it on his own behalf. To do that, he must fully exhaust all administrative rights to appeal with the prison or wait 30 days after his first request to the prison." *Id.* at 833-34 (quotations omitted).

In his initial filing, Buford asserted that he had exhausted his administrative remedies with the BOP, but he did not provide any evidence of exhaustion. The government asserted it had no record of Buford making a request for release, but it also failed to provide any evidence on the issue of exhaustion. The Court therefore directed the parties to file supplemental papers with supporting evidence on their exhaustion positions.

The record as supplemented shows that on April 8, 2020, Buford's wife wrote to the warden asking for her husband to be released to home confinement because of the coronavirus. Also on April 8, 2020, Buford filled out a form titled "Inmate Request to Staff" in which he asked to be considered for home confinement due to COVID-19. A staff member responded to his request on the same form, on May 12, 2020, stating:

> Please be advised that an effort is being made to assess every inmate as soon as possible. It appears that you do not meet the criteria for this activity at this time. Unit team has concluded your exclusion based on your "medium risk recidivism level." If you feel an error has occurred, please advise your unit team.

ECF No. 1668-3, PageID.10601.

Buford also states that he made a second request for release on May 3, 2020, to the warden. He attached signed statements from him and two other inmates attesting to the May 3, 2020, request. The statements say they are made under penalty of perjury but are not notarized. Buford states he never received a response to the May 3, 2020, request.

On June 4, 2020, Buford's attorney made a letter-request to the warden for compassionate release. The request was denied in a letter dated June 5, 2020, which is signed by John T. LeMaster, Senior Counsel, not the warden. The letter states in pertinent part:

> I note that you are a 50-year old man, CARE Level I, healthy inmate with stable conditions. At this time, you have not identified any extraordinary or compelling circumstances warranting consideration for compassionate release. The BOP is taking extraordinary measures to contain the spread and effects of the virus. However, your concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an

> early release from your sentence. Accordingly, based on the available information you do not qualify and your RIS is denied.

(ECF No. 1667-5, PageID.10577). The letter also advised Buford of his right to appeal under the administrative remedy program.

The government takes the position that only the June 4, 2020, letter from Buford's lawyer may be considered as a request for relief, because the other letters referenced "home confinement" and not "compassionate release" by name. Therefore, it maintains that Buford will not have exhausted his administrative remedies until July 5, 2020, 30 days after receipt of the June 4, 2020, denial letter.

The Court disagrees. The requests made by Buford and his wife were sufficiently specific to trigger the administrative process contemplated by 18 U.S.C. § 3582(c)(1)(A). Thirty days lapsed from the date of the request before Buford filed his motion for relief on May 19, 2020.

However, although Buford has exhausted his claim, he not made a convincing case that he is at an elevated risk for complications from COVID-19. His request for release under section 3582(c)(1)(A)(i) must be premised on "extraordinary and compelling reasons." There are no clear guidelines for establishing those grounds, but courts have applied this standard in the wake of the pandemic with the CDC guidelines in mind, accounting for both individual and institutional risk factors. In *United States v. Salic*, No. 08-cr-287, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020), for instance, the defendant had hypertension for which he was prescribed Lisinopril and baby aspirin. He was also housed at a facility where COVID-19 cases were reported. The defendant had only five more months to serve before being eligible for home confinement and had received permission from his unit manager to transfer to a halfway house. The defendant's application for reentry was in process at the time of the court's decision. The district court considered all of these factors in determining that early release was warranted.

In *United States v. Rodriguez*, No. 03-cr-00271, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020), the defendant was in year 17 of a 20-year sentence. He had significant health issues including Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and liver abnormalities. He was housed at a facility with confirmed cases of COVID-19. He had a good prison record and showed improvement in prison. Notably, the district court determined that none of those factors (length of sentence, health condition, and prison record) alone were sufficient to warrant release. However, when taken together, they persuaded the court that release was warranted.

In United *States v. Coker*, No. 14-085, 2020 WL 1877800 (E.D. Tenn. Apr. 15, 2020), the defendant was wheelchair-bound with severe terminal chronic obstructive pulmonary disease that required oxygen therapy, which the BOP admittedly could not provide. The district court therefore found that the request for relief demonstrated a serious enough condition to warrant release even in the absence of heightened risk from COVID-19.

And in *United States v. Saad*, No. 16-20197, 2020 WL 2065476 (E.D. Mich. Apr. 29, 2020), the defendant had served 33 months of a 72-month sentence for a non-violent drug offense. He was 71 years old and housed at FCI Milan, which has several confirmed cases of COVID-19. He also suffered from a host of medical conditions, including kidney disease, hypertension, pulmonary hypertension, sleep apnea, shingles, diabetes, back problems, and a frozen thigh from an overdose of coumadin given by prison officials. He also had heart surgery and knee replacement surgery. He had also recently been diagnosed with recurrent bladder cancer. The district court concluded that this combination of serious medical conditions plus the time he had served on a non-violent offense justified reducing his sentence and release to home confinement.

The common features of the few recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic included properly exhausted claims that unreasonably were refused despite the existence of severe, chronic, or terminal conditions that might warrant release even in the absence of a pandemic.

It cannot be gainsaid that the danger posed by the coronavirus is real. The virus causes a respiratory disease that can result in serious illness or death. It is a new strain of coronavirus not previously identified in humans, and it easily spreads from person to person. There is currently no approved vaccine or antiviral treatment for the disease, known as COVID-19. Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, estimated that between 100,000 and 240,000 people in the United States will die from COVID-19-related complications. Michael D. Shear et al., Coronavirus May Kill 100,000 to 240,000 in U.S. Despite Actions, Officials Say, N.Y. Times, Mar. 31, 2020, https://www.nytimes.com/2020/03/31/us/politics/coronavirus-death-toll-united-states.html.

The CDC has outlined sever medical conditions that place an individual at a higher risk of complications should they contract COVID-19. They include people 65 years and older; people who live in a nursing home or long-term care facility; and people of all ages with underlying medical conditions, particularly if not well controlled, including: (1) people with chronic lung disease or moderate to severe asthma, (2) people who have serious heart conditions, (3) people who are immunocompromised, (4) people with severe obesity (body mass index [BMI] of 40 or higher); (5) people with diabetes, (6) people with chronic kidney disease undergoing dialysis, and (7) people with liver disease. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The CDC also has noted that "current data suggest a disproportionate burden of illness and death among racial and ethnic minority groups."

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-inorities.html. And in Michigan, "African Americans account for 33% of COVID-19 cases and 40% of the deaths, according to state data, though they make up 14% of the state's population." https://news.umich.edu/african-americans-and-covid-19-in-michigan-u-m-experts-available/

The CDC also has issued guidance acknowledging that detention facilities "present [] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional detention.html. "The CDC noted that many detention conditions create a heightened risk [for] detainees. These include low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing)." *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *2 (E.D. Mich. Mar. 27, 2020). Terminal Island has been the subject of criticism due to the large number of inmates who have tested positive for COVID-19. *See* https://www.latimes.com/california/story/2020-05-17/officials-mishandled-lompoc-terminal-island-prison-outbreaks-lawsuit. To date, the BOP has reported 8 open cases, 9 inmate deaths, 677 inmates recovered, and 14 staff recovered. *See* https://www.bop.gov/coronavirus/ .

Consideration of the relevant factors in this case do not warrant Buford's release. His age and medical condition do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the COVID-19 pandemic. Buford argues that because he is

an African-American male, he has aged more quickly "at the cellular level" and is therefore older than his 50 years. Even if it is true that growing up in a certain geographic area subject to discrimination and other difficulties affects a person's health, and even accepting that Buford may be 1.5 to 3 years older biologically than his 50-year old peers, Buford would still be only 51 to 53 years old "biologically," which does not put him in a high-risk group for susceptibility to COVID-19-related complications. As for his documented health, Buford has mild asthma, hypertension (benign essential), mild kidney disease, and Type II diabetes, all of which are managed with medication and exercise. Moreover, Buford already has had COVID-19, and his health conditions did not cause him to suffer severe health complications. He was, in fact, asymptomatic.

Medical science has not yet furnished a clear answer to whether an individual can contract COVID-19 a second time, but according to the Center for Disease Control, re-infection of similar type viruses is unlikely. *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html (explaining viral immunity) (last visited on May 26, 2020). As one court in this district recently held, "[t]he risk of contracting COVID-19 a second time and potentially developing a more severe response is not akin to the type of 'extraordinary and compelling reasons' justifying compassionate release identified by the Sentencing Commission." *United States v. Bland*, Case No. 18-20555 (E.D. Mich. May 28, 2020) (denying compassionate release to an inmate who "tested positive for COVID-19 . . . experienced mild symptoms, recovered, and was released back to his unit").

Buford, however, notes that another inmate at Terminal Island contracted COVID-19, was deemed recovered, and eventually died. The BOP issued a press release regarding the inmate Adrian Solarzano. Solarzano was referenced in a *Los Angeles Times* article attached to Buford's reply. Buford says that even though he has recovered from COVID-19, he remains susceptible

and could possibly die, as did Solarzano. Solarzano tested positive for COVID-19 in April of 2020 and was considered recovered by May 10. Five days later, he was admitted to a hospital for chest pains and anxiety. As the press release states, he was then tested twice at the hospital for COVID-19, with negative results. The press release does not indicate what caused Solarzano's death, other than mentioning that he had "long-term, pre-existing medical conditions." (ECF No. 1667-8, PageID.10588). This evidence is anecdotal at best and does not support Buford's argument that he could get COVID-19 twice with potentially life-threatening results.

None of this is to minimize the seriousness of the coronavirus pandemic or the alarming rapidity of its spread within federal prisons, particularly at Terminal Island. But the pandemic is a global phenomenon and some risk is inherent no matter where Buford resides, either at home or in prison. He asserts that his risk would be lower at home, but he has not put forth any convincing evidence to demonstrate that he is at an especially elevated risk of harm in the present situation of confinement. And both California and Michigan have a staggering number of confirmed COVID-19 cases. Buford has not demonstrated "extraordinary and compelling reasons" to reduce his sentence to time served.

### III.

Buford also requests that the Court recommend that the BOP place him in home confinement under the CARES Act, 18 U.S.C. § 12003(b)(2). A defendant's request for home confinement under the CARES Act is different than a request for compassionate release under 18 U.S.C. § 3582(c)(1)(A). *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281 (2020); *United States of America, v. Benjamin Gordon*, No. CR416-082, 2020 WL 3964041, at *1 (S.D. Ga. July 13, 2020). Section 12001(b)(2) is directed at the Attorney General. If he finds that emergency conditions will materially affect the

functioning of the BOP, the Director of the BOP may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of 18 U.S.C. § 3624(c)(2). Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281 (2020). And the Attorney General has done just that: in a memorandum issued on April 3, 2020, the Attorney General utilized his authority under the CARES Act to direct the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and at other similarly situated BOP facilities where COVID-19 is materially affecting operations." *See* Memorandum from the Attorney General to the Director of the Bureau of Prisons (Apr. 3, 2020), available at https://www.justice.gov/file/1266661/download.

But under section 12001(b)(2), "[d]esignation of an inmate's place of confinement, including placement in home confinement, rests within the absolute discretion of the BOP." *United States v. McCloskey*, No. 18-CR-260, 2020 WL 3078332, at *2 (S.D. Ga. June 9, 2020); *see also United States v. Calderon*, No. 1911445, 2020 WL 883084, at *1 (11th Cir. Feb. 24, 2020) (explaining that under 34 U.S.C. § 60541(g)(1)(A), the Attorney General "may" release eligible elderly offenders, and the district court was without jurisdiction to grant relief). Therefore, the district court has no authority to grant relief under section 12003(b)(2).

However, the defendant's request might be invoking a similar provision of the Second Chance Act. "The Second Chance Act of 2007 . . . increases a federal prisoner's eligibility for pre-release placement in a halfway house from 6 to 12 months, and requires the Bureau of Prisons (BOP) to make an individual determination that ensures that the placement is 'of sufficient duration to provide the greatest likelihood of successful reintegration into the community.'" *Vasquez v. Strada*, 684 F.3d 431, 432-33 (3d Cir. 2012) (quoting 18 U.S.C. § 3624(c)(6)(C)). "In

accordance with the Act, regulations were issued so that placement in a community correctional facility by the BOP is conducted in a manner consistent with 18 U.S.C. § 3621(b)." *Ibid.* (citing 28 C.F.R. § 570.22). That statute, in turn, states that any recommendation by the sentencing court that a convicted person serve a term of imprisonment in a community corrections facility "shall have no binding effect on the authority of the Bureau . . . to determine or change the place of imprisonment of that person." 18 U.S.C. § 3621(b). Relevant factors that the BOP shall consider include "(1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence; and (5) any pertinent policy statement issued by the Sentencing Commission." *Lovett v. Hogsten*, No. 09-5605, 2009 WL 5851205, at *1 (6th Cir. Dec. 29, 2009) (citing 18 U.S.C. § 3621(b)).

Buford's prison record appears to be clear. But the Court believes that the BOP is in a better position than the Court to assess the propriety of the defendant's placement for reentry at an appropriate time, based on the applicable statutory factors and all of the information then available.

IV.

Buford has exhausted his administrative remedies, but he has not demonstrated that compassionate release under 18 U.S.C. 3582(c)(1)(A)(i) is justified.

Accordingly, it is **ORDERED** that the defendant's motion for compassionate release (ECF No. 1639) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   July 17, 2020